UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/12/2024
```

UNITED STATES OF AMERICA,

    -against-

SHMIEL WEINGARTEN, YOIL WEINGARTEN,
and YAKOV WEINGARTEN,

                        Defendants.

S3 19-CR-497 (NSR)
(06) (07) (08)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

       This case involves the kidnapping of two minors, Minor-1 and Minor-2 (collectively, "the Minors"), from their Mother in New York by members of Lev Tahor, an insular religious community currently based in Guatemala, of which the Mother and the Minors were previously members. *Pro se* Defendants Shmiel Weingarten, Yakev Weingarten,[1] and Yoil Weingarten (collectively, the "Weingartens") are members of Lev Tahor whom the Government charged in a six-count superseding indictment for their involvement in the kidnapping of the Minors.[2] ("S3," ECF No. 358.)  A jury trial for the Weingartens is scheduled on February 27, 2024.

       Presently pending before the Court are the parties' motions in *limine* in anticipation of such jury trial: the Government's motion ("Gov't MIL," ECF No. 927), Yakev's Opposition ("Defs. Opp.," ECF No. 936), which Shmiel and Yoil both joined in full (ECF Nos. 934, 935), and the

---

[1] While the Indictment charges "Yakov" Weingarten, the parties indicate the correct spelling of the defendant's first name is "Yakev."

[2] The Government also charged Nachman Helbrans (01), Mayer Rosner (02), Aron Rosner (03), Jacob Rosner (04), Matityau Malka (05), and Mordechay Malka (09). On March 31, 2022, the Court sentenced Nachman Helbrans and Mayer Rosner after a jury found them guilty of the offenses charged against them. On September 7 and September 9, 2022, the Court sentenced Matityau and Mordechay Malka after a jury found them guilty of the offenses charged against them. On September 7, 2022, the Court sentenced Jacob Rosner upon him entering a guilty plea pursuant to an agreement with the Government. On June 6, 2023, the Court sentenced Aron Rosner also pursuant to a guilty plea.

       Given that most of these defendants share the same last names, the Court will refer individually to the Defendants by their first name for the sake of clarity.

Government's Reply (Gov't Reply, ECF No. 938). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Government's motions.

## BACKGROUND

The following background derives from the Government's allegations as charged in the S3 Superseding Indictment and other relevant court filings.

### I.    Lev Tahor and the "Marriage" of Minor-1

All Defendants in this case are members of Lev Tahor, a Jewish religious community of about 250 members founded in the 1980s by Nachman Helbrans's father. (S3 ¶ 3.) Nachman took over as the community's leader after his father passed away in 2016 or 2017. (*Id.*) Regardless of their age, all brides in the Lev Tahor community are required to have sex with their husbands on predetermined intervals and new brides and grooms are instructed by community leaders on when and how to have sex before they are married. (*Id.* ¶ 7.)

In 2017, Nachman arranged to have Minor-1, his then-twelve-year-old niece, engaged to be religiously "married" to Jacob Rosner, who was eighteen years old at the time. (*Id.* ¶ 6.) Minor-1 and Jacob were religiously "married" the following year when she was thirteen and he was nineteen. (*Id.*) They were never legally married. (*Id.*) They immediately began a sexual relationship with the goal of procreation. (*Id.*)

### II.    Mother and Minors relocate to the United States

In early November 2018, the Mother and her six children, including the Minors, left Lev Tahor and relocated to the United States. (*Id.* ¶ 8.)

On November 14, 2018, the Kings County Family Court in Brooklyn, New York (the "Family Court") granted the Mother temporary sole custody over her six children, including the Minors, and enjoined the children's father, Aaron Teller, a leader in the Lev Tahor community not

named as a defendant in this case, from having any communication with the children. (*Id.*) The orders of the Family Court are collectively referred to as "the Family Court Order."

## III.    December 2018

After the Mother and her children left Guatemala, the Defendants and others devised a plan to return the Minors, then fourteen and twelve years old, to Lev Tahor. (*Id.* ¶ 9.) At approximately 3:00 a.m., on December 8, 2018, Helbrans, Mordechay, Jacob, Shmiel, and others removed the Minors from a home in Woodridge, New York. (*Id.* ¶ 10.) They, along with others, took the Minors to a hotel where they were provided with new clothes before they were driven to Scranton International Airport in Pennsylvania. Nachman and the Minors, dressed in secular clothing, and using passports bearing the names of two of Nachman's children proceeded through airport security in Scranton, flew to Washington, D.C., then to Texas, and then took a bus across the border to Mexico. (*Id.* ¶ 11.) Other Defendants, including Mordechay, Shmiel, and Jacob, took separate routes out of the country to Mexico. (*Id.*) Once in Mexico, Nachman and others transported the Minors to several hotels and residences with assistance from Lev Tahor members in the United States, Mexico, and Guatemala. At various times, Nachman and the Minors were met by Mayer Rosner, Jacob, Yoil Weingarten, Matityau, and others. (*Id.* ¶ 12.)

On December 18, 2018, Mexican law enforcement raided a house in San Miguel Tlaixpan, Mexico, and detained Nachman, Mayer, Jacob, and Matityau, among other individuals. On December 26, 2018, officials from Mexico's immigration authority, Instituto Nacional de Migración ("INM"), informed the FBI that INM had elected to deport Nachman, Mayer, Jacob, and Matityau—all of whom were and are U.S. citizens—from Mexico and deliver them into the custody of the FBI. On December 27, 2018, two INM officials accompanied Nachman, Mayer, Jacob, and Matityau on a commercial flight from Mexico City to New York. The FBI arrested

3

Nachman, Mayer, and Jacob upon their arrival at John F. Kennedy International Airport (Minute Entries dated December 27, 2018), pursuant to a complaint alleging that that they conspired to kidnap two victims. (Dkt No. 18 MJ 10939, ECF No. 1.)

On December 27, 2018, the Minors were recovered at a hotel in Mexico. (S3 ¶ 13.) At the time, the Minors were accompanied by Shmiel and Yoil Weingarten. (*Id.*) In December 2018, the entire Lev Tahor community was seeking asylum in Iran. (*Id.* ¶ 14.)

## IV.    March 2019

In March 2019, approximately three months after the Minors were recovered in Mexico, Helbrans, Yakev, Matityau, and others, attempted to remove Minor-1 a second time. (S3 ¶ 15.) On March 26, 2019, a complaint was filed charging Matityau with conspiracy to kidnap and conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1201, 1512, and 2. (Dkt No. 19 MJ 3011, ECF No. 1.) Matityau was arrested the same day. (Minute Entry dated March 26, 2019.)

## V.    The 2019 Indictments

On July 8, 2019, the Government sought and obtained a four-count Indictment charging (1) all Defendants with conspiracy (i) to commit international parental kidnapping, (ii) to unlawfully use a means of identification, and (iii) to enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; (2) all Defendants (except Mordechay) with two counts of international parental kidnapping (one for each Minor in the December Kidnapping), in violation of 18 U.S.C. § 1204; and (3)  Nachman, Matityau, and Yakev with another count of international parental kidnapping (for the March 2019 attempted kidnapping of Minor-1), in violation of 18 U.S.C. § 1204. The Government charged Mordechay, Yoil, Shmiel, and Yakev in a separate sealed superseding indictment containing the same counts and allegations, S1 19 Cr. 497 (ECF No. 52),

because, at the time, these four Defendants were at-large. None of the indictments charge any of the Defendants with violating 18 U.S.C. § 1201.

## VI.    Hague Convention Proceedings

On May 29, 2019, Teller, the father of the Minors, filed a petition in the United States District Court for the Eastern District of New York ("the Hague Court"), under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"),[3] seeking the expedited return of his six children to Guatemala, including the Minors. (*Teller v. Helbrans,* 19 Civ. 3172 (SJB) (E.D.N.Y.) (the "Hague Case") at ECF No. 1.) On October 22, 2019, the Hague Court denied Teller's petition with prejudice, holding that Teller had "engaged in a pattern and practice of misconduct and paid little attention to and disregarded the obligations attendant to a litigant in a federal civil proceeding," because Teller had "repeatedly told [the court] that he [had] no intention of appearing for any trial," and that "[f]rom the start, Teller has resisted discovery, failed to attend any proceeding, and clearly never intended to appear in the United States." (Hague Case, ECF No. 110.)

On December 9, 2019, Teller filed a notice of appeal. (Dkt. No. 19-4063 (2d Cir.) at ECF No. 1.) On February 7, 2020, the Second Circuit dismissed the appeal because Teller failed to file a required form. (*Id*. at ECF No. 21.)

## VII.    March 2021

In March 2021, Co-Conspirator-1 ("CC-1"), a member of Lev Tahor, approached the Minors in New York and attempted to remove them again. (S3 ¶ 16.) At the time, CC-1 possessed

---

[3]  "The Hague Convention, which was drafted in 1980 and, as of May 1995, had been ratified by forty-one nations, . . . was adopted in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997) (quoting the Hague Convention, preamble).

three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Minors. By late March 2021, CC-1 had returned to Guatemala. (*Id.*)

## VIII.   Relevant Procedural Background

On September 28, 2021, the Government filed the Superseding Indictment (S3).[4] (ECF No. 358.) In that Superseding Indictment, the Government charges the Weingartens with (i) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a), (e) ("Count One"); (ii) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. §§ 2423(b), (e) ("Count Two"); (iii) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371 ("Count Three"); and (iv) two counts of international parental kidnapping, in violation of 18 U.S.C. § 1204, in connection with a December 2018 kidnapping ("Count Four" and "Count Five"). (*Id.*) Yakev is also charged with an additional count of international parental kidnapping in violation of 18 U.S.C. § 1204 in connection with a March 2019 attempted kidnapping (together with Count Four and Count Five, "the Kidnapping Counts"). (*Id.*)

On April 22, 2022, Shmiel and Yakev were arrested and arraigned with respect to the charges brought against them in the S3 Superseding Indictment. (Minute Entry dated 04/22/2022.) On May 10, 2022, the Court held the initial appearance for Shmiel and Yakev. (Minute Entry dated 05/10/2022.) At the hearing, the Government indicated it was ready to provide all group discovery protection as soon as the Protective Order was signed. (*Id.*) Defendants declined to sign the

---

[4] On November 10, 2021, a jury convicted Nachman and Mayer of all charges the Government brought against them. (*See* Minute Entry dated 11/10/2021.) On June 2, 2022, a jury convicted Matityau and Mordechay on all charges brought against them. (*See* Minute Entry dated 06/02/2022.) Charges against Aron and Jacob Rosner have reached a disposition through guilty pleas pursuant to agreements with the Government.

Protective Order, stated they did not need a Yiddish interpreter and stated they were ready to proceed *pro se*. (*Id.*) The Court issued the Protective Order in the interests of efficiency and scheduled a status conference for July 18, 2022 to provide counsel as well as Shmiel and Yakev time to review discovery. (*Id.*) That same day, the Court held a Faretta hearing, and subsequently granted Shmiel and Yakev's request to proceed *pro se* and appointed Criminal Justice Act ("CJA") counsel as standby counsel. (*id.*; ECF Nos. 622, 623.) The Court also issued an Order authorizing Shmiel and Yakev to obtain a laptop computer or similar device to assist them in preparing their defense, and the use of CJA funds for necessary hard drives, software cables, or adapters. (ECF No. 624.) Yoil would not be arrested and arraigned until September 23, 2022, and the Court issued a similar Order for him on November 7, 2022. (ECF No. 770.)

On June 13, 2022, the Court reiterated to Yakev and Shmiel that they each represent himself and himself only, and each defendant must communicate with the Court on his own behalf. (ECF No. 673.) That same day, the Court also appointed standby associate counsel for Yakev. (ECF No. 675.) On July 13, 2022, Shmiel sent a letter to the Court requesting that it appoint new standby counsel, and the Court reserved its decision until the status conference scheduled for mid-July. (ECF Nos. 696-697.)

At the July 18, 2022 status conference, the Government indicated the majority of discovery had been produced in May, and an additional production had been made to standby counsel the day prior. (Minute Entry dated 07/18/2022.) Yakev requested additional software for his computer and raised issues with accessing discovery materials. Standby counsel for Shmiel stated he was in the process of obtaining a laptop for his client, and both he and Shmiel renewed the application for the Court to appoint new standby counsel. On October 21, 2022, the Court appointed Shmiel new standby counsel.

On November 2, 2022, all three Weingartens appeared at the status conference. That same day, the Court held a Faretta hearing and granted Yoil's request to appear *pro se* and appointed him CJA counsel. (ECF No. 767.) The Government indicated that all substantive discovery had been produced via hard drives. (Minute Entry dated 11/02/2022.)

On March 10, 2023, the Court scheduled a four-week jury trial for February 27, 2024, and set a briefing schedule for the parties' pre-trial motions, with moving papers to be filed May 25, 2023, opposition papers on June 23, 2023, and reply papers on July 10, 2023. (Minute Entry dated 03/10/2023.) The Weingartens objected to the trial date and the briefing schedule, which the Court noted. The Court also encouraged the Weingartens to consult with their respective standby counsel in preparing for motion practice and trial. The Weingartens again raised issues with accessing resources, specifically that they were unable to bring their laptops to legal visits with their standby counsel and that thumb drives were prohibited. To address this issue, on March 13, 2023, the Court issued a memorandum endorsement granting Defendants' request to bring their laptops to legal meetings with their respective standby counsel and their standby counsel's request to bring an external hard drive. (ECF Nos. 826, 827, 828.)

On May 16, 2023, Yoil filed a motion requesting an extension of the deadline for pretrial motions until September 2023. (ECF No. 847.) On May 22, 2023, Shmiel likewise filed a motion asking for an extension until September 2023. (ECF No. 853.) In response, the Court extended Defendants' deadlines to file pretrial motions until July 10, 2023. (ECF No. 854.)

On July 10, 2023, Yoil filed a letter motion (1) raising concerns about resources available as an incarcerated *pro se* defendant for discovery review and motion drafting, and (2) "adopt[ing] all arguments . . . advanced by the previous co-defendants and their attorneys." (ECF No. 859.) Specifically, Yoil submitted a letter to the Court advancing a number of allegations and requests,

including that the Court recuse itself from this case because of its alleged bias as well as a generalized demand that the Court "enforce" its previous orders regarding providing Defendants with the tools they needed to review discovery and submit pre-trial motions. Yoil indicated, specifically, that he was not given enough time to file motions under the briefing schedule established at the March 10, 2023 status conference, which provided him until July 10, 2023 to file a pretrial motions. Shmiel and Yakev sought to join Yoil's letter motion. (ECF Nos. 861, 867.)

Following a response from the Government, the Court construed Yoil's letter as a request for an extension of time to file pretrial motions and on July 17, 2023 granted Defendants a second extension of time to file his motions until September 30, 2023. (ECF No. 865.) On August 7, 2023 and August 18, 2023, respectfully, the Court similarly provided a second extension to Yakev and Shmiel. (ECF Nos. 868, 874.) At a status conference held on September 7, 2023, the Weingartens indicated that they had not written motions due to limited internet access, printing issues, and translation issues. (Minute Entry dated 09/07/2023.) The Court reminded them that when they sought leave to proceed *pro se* they had been warned of limitations, directed them to confer with standby counsel, and stated that the Court could not control internet access at the Westchester County Jail (the "Facility"). (*Id.*) The Court extended the Defendants' deadline to file pretrial motions for a third time until November 15, 2023. (ECF No. 882.) The Court also reiterated that standby counsel should assist the Weingartens with printing and filing moving papers. (*Id.*).

On November 15, 2023, in lieu of filing pre-trial motions, Defendants filed identical letter motions again raising the issue of "limited internet access, translation software and printing capabilities." (ECF Nos. 903, 904, and 909.) Defendants also "adopt[ed] *all* legal arguments (not the facts) advanced by the other co-defendants, including but not limited to the arguments mentioned in ECF nos. 123, 133, 190, 191, 316-320, and 544." (*Id.*) (emphasis in original). In light

of Defendants' *pro se* status, the Court directed the Government to respond, and the Government did on November 17, 2023. (ECF No. 912.)

On November 20, 2023, the Court issued an Order declaring that their time for filing pre-trial motions had expired but permitting the Weingartens to adopt legal arguments previously raised by their co-defendants. (ECF No. 915.) The Court further directed the Government to file opposition papers by December 11, 2023 and the Weingartens to file Reply papers by January 16, 2024. (*Id.*) The Government filed its opposition on December 11, 2023 (ECF No. 924). The Weingartens did not file a reply. On February 12, 2024, the Court issued an Order denying the Weingarten's motion on the grounds that they failed to supplement their arguments, and thus the Court adhered to its prior rulings. (ECF No. 954.)

At the November 20, 2023 status conference, the Court set a deadline for submission of 3500 materials, proposed jury instructions, proposed verdict sheet, witness lists, exhibit lists, and copies of pre-marked, tabbed exhibits (in binders). The Court also set a briefing schedule for the parties' motions in limine. The final pre-trial conference is scheduled for February 15, 2024. (Minute Entry 11/20/2023.)

On December 5, 2023, the Weingartens again raised issues of internet access and delayed receipt of the Government's filing in a letter to the Court. (ECF No. 919.) In response, the Court reiterated that it had no control over internet access at the facility where the Weingartens were detained and urged them to utilize standby counsel. (ECF No. 920.) To address the issue of delayed receipt of mailings, the Court directed the Government to inquire whether the Government could fax filings to the Weingartens. (ECF No. 928.) On January 29, 2024, in advance of trial, the Government filed a letter informing the Court that, although fax was unavailable, it would utilize two other methods to expedite delivery of case-related correspondence: (1) in addition to next-day

delivery via Federal Express, the Government would email any correspondence to the Assistant Warden and request print and hand-delivery of the filing and (2) the Government would send mailings in brown envelopes to allow for quick identification and delivery. (ECF No. 937.)

On January 5, 2024, the Government filed its motions in limine. (Gov't MIL, ECF No. 928.) On January 22, 2024, Yakev filed his Opposition to the Government's motion in limie ("Defs. Opp.," ECF No. 936), which Shmiel and Yoil both adopted in full (ECF Nos. 934, 935). On February 7, 2024, the Government filed its reply. ("Gov't Reply," ECF No. 940.)

## LEGAL STANDARDS

### IX. Admissibility of Evidence

The party seeking to introduce evidence bears the burden of establishing its relevance. *See Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990). Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985), the Court has "broad discretion to balance probative value against possible prejudice" under Rule 403, *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008).

With certain exceptions, all relevant evidence is admissible, and evidence which is not relevant is not admissible. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). Relevant evidence may still be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see United States v. Hsu*, 669 F.3d 112, 119 (2d Cir. 2012) (noting that "[d]istrict courts have broad discretion to balance probative value against possible prejudice"). Applying Rule 403, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by unduly

distracting their attention from the charged crimes through sympathy. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming district court's exclusion of evidence that defendant's son had cerebral palsy because such evidence "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case"); *United States v. Sabir*, No. 5-CR-673 (LAP), 2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007) (excluding evidence because it "would suggest that the jurors should have sympathy for Dr. Sabir because of his troubled childhood and would implicitly encourage them to nullify by acquitting him based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt"); *United States v. Crown*, No. 99- CR-1044 (AGS), 2000 WL 709003, at *3 (S.D.N.Y. May 31, 2000) (precluding evidence regarding defendant's medical condition as irrelevant and holding that even if the evidence were relevant, "its probative value would be outweighed by its potential prejudicial effect on the jury" because it "would likely appeal to the jury's sympathy, and thus constitute an improper influence on the jury members' consideration of the factual and legal issues bearing on the merits of the case").

Evidence is also inadmissible if it is hearsay not subject to a hearsay exception. "Hearsay" is a statement "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). There are various exceptions to the hearsay rule including that certain out of court statements are not hearsay if (1) they are a declarant-witnesses' prior statement, or (2) an opposing party's statement offered against the defendant. Fed. R. Evid. 801(d).

## X.  Motions in Limine

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)). An *in*

*limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "[C]ourts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09–CR–1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

## DISCUSSION

By its motions in limine, the Government asks the Court to determine the admissibility of:

(1) the Defendants' (*i.e.*, the Weingartens' and their co-defendants') prior bad acts, including the rules and practices within Lev Tahor surrounding marriage;

(2) the statements of the Weingartens' co-conspirators; and

(3) certain business records from various entities that would be certified under Federal Rule of Evidence 902(11).

(Govt't MIL at 8–23, 27–35.) Additionally, the Government asks the Court to preclude the Weingartens from making the following arguments or eliciting related testimony for lack of relevance and/or improper purpose:

(1) arguing that Lev Tahor has been historically persecuted by the U.S. and Israel;

(2) arguing that the Defendants are being prosecuted for their religious views;

(3) arguing that the marriage between Jacob and Minor-1 is a legitimate marriage and as such, is a defense to kidnapping and/or the marital privilege applies to prevent Minor-1's testimony;

(4) arguing that the marriage between Jacob and Minor-1 was predicated on their religious beliefs and such conduct was not illegal;

(5) arguing that the Minors' consent to traveling with the Defendants out of the country and Minor-1's consent to have sex with an adult is a defense to the charged crimes; and

(6) contesting the legitimacy of the Family Court Order granting the Mother sole custody over the two Minors.

(*Id.* at 23–27.) Defendants otherwise contest the Government's motion primarily on three grounds: (1) the Government seeks to introduce irrelevant and prejudicial evidence about the sexual and marital practices of Lev Tahor, including Yakev's marriage; (2) the Government seeks to improperly preclude positive background evidence, such as the consensual nature of Minor-1 and Yakev's sexual relationship and the positive nature of their marriage; and (3) the Government should be prohibited from introducing co-conspirators' statements. (Defs. Opp. at 1-2.) Finally, the Weingartens also "adopt the arguments (not the facts)" of the motions in limine filed by previous co-defendants, particularly the Malkas' Reply to the Government's Opposition to Motion *in Limine* and Motion to Dismiss, ECF No. 544. (*Id.* at 2.) With respect to those arguments that the Weingartens raise by incorporating by reference the previous motions that the Court has already decided and for which the Weingartens fail to provide any supplementary arguments, the Court adheres to its prior rulings from each of such motions. (*See* ECF Nos. 388, 625.)

I.    **Defendants' Ability to Prepare and Present their Defense**

At the outset, the Court addresses Defendants contention that they are "severely limited" in their defense preparation and cannot respond "in detail" to the Government's motions, an issue that the Court has addressed at every conference in this matter since at least the first *Faretta* hearing in May 2022.

The Supreme Court has observed that "*Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal defendant." *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005). The Supreme Court acknowledged that "federal appellate courts have split on whether *Faretta*,

14

which establishes a Sixth Amendment right to self-representation, implies a right of the *pro se* defendant to have access to a law library" but has not had occasion to resolve the issue. *Id.*, *see, e.g.*, *Hawkins v. Dexter*, No. C08-1087 SI (PR), 2008 WL 1777375, at *2 (N.D. Cal. Apr. 18, 2008) (explaining that while a criminal defendant "had a right to represent himself, there is no clearly established law from the U.S. Supreme Court as to the supplies and services that had to be provided to him to conduct that representation"). "*Faretta* itself recognized that '[w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.'" *United States v. Denton*, 535 F. App'x 832, 835 (11th Cir. 2013) (quoting *Faretta*, 422 U.S. at 835) (holding that court did not impose unjustified and extreme restrictions on defendant's ability to access legal materials relevant to the criminal proceedings against him where defendant who was awaiting trial in county jail without a law library who was for a period of two weeks transported daily to the United States Marshals' office in the courthouse where he could review discovery and request legal materials from the court's law librarian. The magistrate judge allowed Denton to be brought to the United States Marshals' office in the courthouse on a daily basis for a two-week period, where he could review discovery and request legal materials from the court's law librarian and thereafter, instead of routine visits to the courthouse, he could file requests for specific legal materials that were relevant to the remaining trial proceedings); *Samuels v. Walker*, No. ED CV 10-01164 DMG, 2011 WL 7637265, at *4 (C.D. Cal. Oct. 12, 2011), *report and recommendation adopted*, No. EDCV 10-01164 DMG RZ, 2012 WL 1068075 (C.D. Cal. Mar. 27, 2012) (denying *pro se* petitioner's claim that trial court, after granting him *pro se* status and appointing a defense investigator, denied his constitutional rights when it rejected his motions for extra law-library time (compared to what ordinarily was accorded to *pro se* jail inmates) and, possibly, for toll-free phone calls). The Second

Circuit has "recognize[d] of course, that the right to represent oneself in criminal proceedings is protected by the Sixth Amendment. But this right does not carry with it a right to state-financed library resources where state-financed legal assistance is available." *Spates v. Manson,* 644 F.2d 80, 85 (2d Cir. 1981); *see Wesley v. City of New York,* No. 05 CIV. 9227 (DLC), 2006 WL 2882972, at *4 (S.D.N.Y. Oct. 10, 2006) (holding that at the time defendant who was representing himself in a criminal case in the early 2000s "neither the Supreme Court nor the Second Circuit had held that a defendant who declines state-funded representation is entitled to any access to a prison library-let alone access at a given time of day").

The Court has been honest with Defendants throughout this case about the perils of proceeding *pro se* and provided for extraordinary resources to enable Defendants to proceed *pro se*. First, since Defendants sought to proceed pro se, the Court has frankly apprised each and every Defendant that proceeding *pro se* despite his lack of formal legal training and/or facility in the English language would inevitably result in challenges, especially during the COVID-19 pandemic. Each Defendant repeatedly and unequivocally asserted his right and preference to proceed *pro se*.

Second, the Court has provided resources to enable Defendants to vigorously defend themselves. For example, the Court appointed standby counsel who are under clear instructions to assist the Defendants, including by conducting legal research for them. The Court also ordered the Government and standby counsel to coordinate with the Facility to ensure that the Defendants received access to the discovery produced in this matter and to laptops on which they could use basic translation software and take notes. The Court permitted Defendants to bring their laptops to legal visits and the use of external hard drives to facilitate standby counsel's assistance in timely filing documents with the Court. The Court granted Defendants numerous extensions to file pre-

trial motions, and with each extension reiterated that they had been warned of limitations and urged them to confer with standby counsel for assistance in making filings. Defendants have had access to their laptops since summer 2022.

Even if Defendants believe that, under different circumstances, they could have raised additional issues, or raised issues more clearly, Defendants have been afforded ample time to do so. The Government produced all substantive discovery to Defendants in early December, providing Defendants approximately a year to review discovery, submit pre-trial motions, and prepare their defense. Rather than use the substantial amount of time available to develop their defense, Defendants instead wholly adopted the legal arguments previously put forth by their co-defendants. Defendants broadly referred to all prior motions *in limine* filed by Nachman, Mayer, and the Malkas, without identifying any specific arguments. To their credit, Defendants specifically pointed to the Malkas' motion to dismiss and opposition to the Government's motion *in limine*—adopting the legal arguments contained in a 50-page motion accompanied by seven exhibits spanning over 100 pages. Defendants broadly espousing the prior arguments advanced by their co-defendants and failing to supplement any of these prior motions demonstrate that, like their co-defendants, Defendants adopted a scorched earth approach to their defense and undermine any suggestion that Defendants would have raised multiple times as many arguments had they been afforded different (unspecified) resources.

Finally, Defendants contend the Government seeks to introduce "a one-sided trial with an empty defense table." (Def. Opp. at 2-3.) To the extent Defendants suggest that they are somehow disadvantaged or that trial proceedings will be unfair or unjust because of their *pro se* status, the Court again reminds Defendants that they do have a right to be represented by counsel and have chosen instead to act as their own lawyers. In the event that they wish to exercise their right to be

represented by counsel during the proceedings, the Court will direct standby counsel to take over Defendants' defense.

## II.     Evidence Government Seeks to Admit

### A.   Defendants' Prior Bad Acts

The Government seeks to elicit testimony "regarding the rules within Lev Tahor and how those rules were enforced, in order to prove the Weingartens' direct involvement in both the sexual exploitation and kidnapping conspiracies." (Gov't MIL at 11-12.) The Government argues this evidence is admissible as direct evidence because (1) evidence of the Defendants' and their coconspirators' involvement in child marriages, in particular Minor-1's marriage, show their direct involvement in the child exploitation offenses of Counts One and Two; (2) the evidence is critical to explaining the motivations and rationale central to the kidnapping plot; and (3) the evidence explains to the jury how the relationship between the Weingartens and their co-conspirators developed. (Gov't MIL at 13-14.) In the alternative, the Government further contends that the evidence is admissible as direct evidence of the charged crimes, or alternatively, admissible under Federal Rule of Evidence 404(b) to show Defendants' motive, intent, knowledge, and opportunity. (*Id.* at 14.)

The Defendants challenge the admissibility of this evidence as irrelevant and prejudicial, and argues the Government seeks to preclude positive evidence disproving these allegations. (Defs. Opp. at 1-2.) While Defendants do not advance any legal arguments in support of their opposition to the introduction of this evidence, Defendants characterize the evidence the Government seeks to admit as a "false horror story" depicting Minor-1 and other Lev Tahor members as "'victims' of systematic forced sex and child marriages." (*Id.* at 1.) In particular, Defendants focus on the Government potentially introducing evidence that "marriage in Lev Tahor

is not about love but only about sex, that Lev Tahor has bizarre sex rules, and that Lev Tahor couples are forced to have sex." (*Id.*)

      1.     Evidence of "Other Acts" under Rule 404(b)

Evidence of a defendant's "crime[s], wrong[s], or other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "In other words, evidence that a defendant committed crimes beyond those presented to the jury is not admissible to show that the defendant is a bad person who is therefore likely to be guilty of the crimes charged." *Hsu*, 669 F.3d at 118. However, Rule 404(b) expressly permits the introduction of evidence of other crimes for a variety of other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit has therefore "adopted the 'inclusionary' rule that other crimes evidence is admissible for any purpose for which it is relevant, except to support the prohibited inferences of bad character or propensity to commit crimes." *Hsu*, 669 F.3d at 118. Additionally, "evidence of criminal behavior may be admissible as direct evidence of the crime charged if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Id.* In other words, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).

      2.     Application

Here, the Government provides a representative list of testimony regarding the rules and practices within the Lev Tahor community that may include testimony of uncharged criminal

conduct or other wrongs or bad actions. (Gov't MIL at 11-12.) Most of these examples relate to testimony from CC-1 and Witness-1 regarding members' of the Hanhala, including the Weingartens', practice of arranging marriages involving children as young twelve or thirteen years old, and Jacob's, Yakev's, and Yoil's inquiries and instructions regarding Witness-1's sexual relationship with his wife. (Gov't MIL at 11-12.)

The anticipated testimony is substantially similar to the testimony the Government sought to introduce in the trial against Nachman and Mayer (the "Helbrans Trial"), which the Court has previously ruled on. (*See* Government's Motion in Limine dated September 24, 2021, "Gov't MIL re Helbrans," at 10-11; ECF No. 388, "Helbrans MIL Opinion," at 33-37.) And in the same manner of their co-defendants, the Weingartens challenge such evidence as irrelevant and prejudicial.

As the Court has previously analyzed these arguments in detail, and neither the Government or the Defendants have supplemented their arguments or identified any distinguishing features present in this trial, the Court adheres to its prior conclusions. The Court determines evidence of Defendants' involvement in arranging marriages, including marriages involving children as young as twelve or thirteen years old, and particularly the marriage between Jacob and Minor-1, is "inextricably intertwined with the evidence regarding the charged offense[s]," *Hsu*, 669 F.3d at 118. The Court agrees that this evidence "manifests [Defendants'] direct involvement in the child exploitation offenses charged in Counts One and Two." (Gov't MIL at 13.)

Accordingly, the Government's evidence regarding uncharged wrongs or bad acts within the Lev Tahor community is limited to evidence directly related to the Defendants' involvement in arranged marriages and/or encouragement and facilitation of sexual activity involving children under the age of sixteen. Insofar as the Government intends to introduce any 404(b) evidence that does not fall squarely within the above approved categories of marriage or sexual relations

involving children under sixteen years of age, the Government will need to demonstrate both relevance and that such information is more probative than prejudicial.

Finally, the Court acknowledges the Weingartens' concerns that the Government will seek to introduce evidence regarding Lev Tahor's sexual practices that are irrelevant to the crimes charged or that may be unduly prejudicial. Accordingly, the Court notes its intention to provide a limiting instruction regarding any testimony about sexual and marriage practices in Lev Tahor other than evidence regarding the relationship between Minor-1 and Jacob Rosner.

### B.  Statements of Co-Conspirators

The Government also intends to introduce certain statements made by the Weingartens' co-conspirators by eliciting testimony from, among others, CC-1, the Mother, Minor-1, and Witness-1, and through electronic evidence. (Gov't MIL at 15.) For example, the Government anticipates the Mother will testify about March 2019 statements Yakev made about the co-conspirators' plans to kidnap Minor-1 and threats he made to Mother about returning the Minors to Lev Tahor. (*Id.* at 20.) The Government contends that these statements are admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), and as statements against interest under Federal Rule of Evidence 804(b)(3). (*Id.*) The Government further *avers* that several of these statements are non-hearsay because they are being offered not for the truth of the matter, but rather for the effect on the listener or for another non-hearsay purpose. (*Id.* at 15 n.6.)

1. Statements by Co-Conspirator in Furtherance of Conspiracy Under Rule 801(d)(2)(E)

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement pursuant to this rule, a district court must find two facts by a preponderance

of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27-28 (1st Cir. 1989) (coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E)) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although only co-conspirator statements made "in furtherance" of the conspiracy are admissible pursuant to Rule 801(d)(2)(E), the standard for what qualifies as a statement "in furtherance" of a conspiracy is not very restrictive. The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). It permits, for example, introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

2.    <u>Statements Against the Declarants' Penal Interest Under Rule 804(b)(3)</u>

The hearsay rule does not exclude the out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See* Fed. R. Evid. 804(b)(3); *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007). A statement is sufficiently against the declarant's penal interest if: a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability. Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

3.    <u>Application</u>

The Court construes Defendants' opposition as challenging that certain co-conspirators or members of Lev Tahor are "unavailable witnesses" under the hearsay rules. (Defs. Opp. at 2.) The Specifically, Defendants maintain the Government (1) "fails to explain why convicted co-defendants will plead the fifth" and (1) falsely claims that some co-defendants are not within the Court's subpoenas power, despite the named co-defendants all being located in the United States. (*Id.*) The Government states in its moving papers that a number of co-conspirators and other members of the Lev Tahor community are located abroad, beyond the Government's subpoena power, and would likely invoke the Fifth Amendment if they were questioned under oath. (Gov't Mem. at 21.)

Defendants' objections to the introduction of co-conspirators' statements appear limited to the introduction of co-defendants' statements. (Def. Opp. at 2 (specifically naming "Aron Rosner, Matityau Malka, Mordechay Malka, Jacob Rosner, and Rabbi Nachman Helbrans").) Statements from the Weingartens' co-defendants are admissible as co-conspirator statements and statements in furtherance of a conspiracy under Rule 801(d)(2)(E), and therefore whether the Defendants are unavailable has no bearing on the admissibility of their statements. *United States v. Inadi*, 475 U.S. 387, 394–98, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (showing of witness unavailability not required under Confrontation Clause for admission of out-of-court statements made by co-conspirators).

Beyond their arguments regarding the availability of witnesses, Defendants do not otherwise challenge the Government's introduction of co-conspirator statements. The Court has previously admitted co-conspirators statements to be introduced as evidence pursuant to Rule

801(d)(2)(E) in the trials of the Weingartens' co-defendants.[5] Accordingly, the Court preliminarily admits the co-conspirator statements described in their motion, "subject to the [Government's] submission of the necessary evidence of [relevant] prerequisites." *Tracy*, 12 F.3d at 1199.

   *C.   Certain Business Records*

   As in the trials of the Defendants' co-defendants, the Government anticipates it will introduce business records (the "Business Records") from several entities, including United Airlines, Google, Walmart, Super 8 Motel, and the Westchester County Jail. (Gov't MIL at 28.) In addition, the Government anticipates introducing video footage from several locations. (*Id.*)

   The Government has provided notice of intent to offer these records and asks the Court to admit the records pursuant to written certifications under Federal Rule of Evidence 902(11).[6] (*Id.*)

   Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for:

   A memorandum, report, record, or data compilation, in any form, of acts [or] events, . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6). Rule 803(6) "favor[s] the admission of evidence rather than its exclusion if it has any probative value at all," *In re Ollag Constr. Equip. Corp.,* 665 F.2d 43, 46 (2d Cir. 1981)

---

[5] For a more detailed analysis, please see the Court's Opinion & Orders dated October 12, 2021 (Helbrans MIL Opinion, at 37-45) and May 11, 2022, (ECF No. 625, "Malkas MIL Opinion," at 22-31.).

[6] The Government indicates that on January 2, 2024, it inquired through standby counsel as to whether Defendants intend to contest the authenticity and business-records-nature of these materials, and if not, whether Defendants would be amenable to stipulations for their authenticity. (Gov't MIL at 28.) Though the Government requested a written response by January 4, 2024, the Government did not receive a response from standby counsel for Yakev or Yoil by January 4, 2024, the date the motions *in limine* were due. (*Id.*) The Government received a response from Shmiel's standby counsel indicating that he was not amendable to any stipulations. (*Id.*) To the extent that Defendants do not contest the authenticity of these records, the Court encourages the parties to stipulate to their authenticity to avoid unnecessary testimony by record custodians. (Gov't MIL at 27–35.)

(quotation omitted), and the "principal precondition" to admissibility "is that the record[ ] [has] sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l v. M/V "EXPORT CHAMPION",* 817 F.2d 1011, 1013 (2d Cir. 1987). Further, the proffered record must be supported by a proper foundation, namely, that the document was "'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the [record].'" *United States v. Freidin,* 849 F.2d 716, 719–20 (2d Cir.1988) (quoting Rule 803(6)). This foundation must be established by the "'testimony of the custodian or other qualified witness' of the record." *Id.* at 720 (quoting Rule 803(6)).

"Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an oral one.'" *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (quoting 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008).). If a party seeks to certify a business record pursuant to Rule 902(11) rather than by providing live testimony pursuant to Rule 803(6)(D), it "must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." Fed. R. Evid. 902(11). This notice requirement "is intended to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration." Fed. R. Evid. 902(11) advisory committee's note.

The Government indicates that it provided notice of its intent to introduce these business records by communication to Defendants directly and through standby counsel on or about January 2, 2024, over a month before the start of the trial, and again in its motions in limine. Accordingly, the Court preliminarily concludes that the Government has provided Defendants with the reasonable notice required under Rule 902(11). *See, e.g.*, *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (holding that reasonable notice had been provided where defendant "had five

full days between when the government disclosed the records and when the records were admitted into evidence, which was sufficient time to verify the records' certification . . . . [and] [i]n those five days, Rom raised no concerns that the bank records were improperly certified or that the foundation was otherwise improper").

Assuming that the Government establishes the relevance of these business records, the Government will be permitted to authenticate them pursuant to written certifications under Federal Rule of Evidence 902(11).

### ii. **Evidence Government Seeks to Preclude**

The Government seeks to preclude several arguments it anticipates Weingartens will raise based on their filings throughout the case. (Gov't MIL at 23-27.) The Government contends that these arguments should be precluded for lack of relevance under Federal Rule of Evidence 401, or, alternatively, under Rule 403 because they would serve an improper purpose. (*Id.*)

From Defendants' opposition filings, Defendants intend to introduce evidence that Minor-1 and Jacob Rosner were engaged in a positive, consensual relationship. (Defs. Opp. at 1.) Regarding the other arguments the Government anticipates Defendants will introduce, although Defendants do not explicitly indicate an intention to introduce the below arguments at trial, Defendants incorporate by reference the legal arguments previously raised by their co-defendants, which includes such arguments.

The Court has previously analyzed in detail, and ultimately precluded, the arguments the Government seek to preclude.[7] Because the Government and Defendants neither supplement the arguments previously raised regarding this evidence or identify any distinguishing features of this trial, the Court adheres to its prior rulings. Defendants do not otherwise challenge the

---

[7] For a more detailed analysis, please see the Court's Opinion & Orders dated October 12, 2021 (*See* Helbrans MIL Opinion at 50-71) and May 11, 2022, (Malkas MIL Opinion at 31-66.).

Government's application. Accordingly, the Court precludes Defendants from introducing the following arguments during trial:

- Absent a compelling argument regarding the relevance of historic persecution, Defendants will be precluded from presenting evidence at trial of historic persecution by the United States or any other government entity or from detailing long-standing tensions between Lev Tahor and any other community.

- Defendants are precluded from arguing that they are being prosecuted because of their religious beliefs.

- Defendants are precluded from arguing that the marriage between Jacob Rosner and Minor-1 was legally valid or that marital privilege applies. Moreover, Defendants are precluded from arguing that Jacob Rosner and Minor-1's kidnapping is a defense to marriage.

- Defendants are precluded from arguing that because Jacob Rosner and Minor-1's marriage and sexual relationship was sanctioned by defendants' religious beliefs, they are not subject to prosecution.

- Defendants are precluded from arguing that the Family Court Order, which granted Mother sole custody over the Minors, was fraudulently obtained.

- Defendants are precluded from arguing that because the Minors were not removed from the country by force or that Minor-1 consented to sex, Defendants' conduct is excused.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Government's motions in *limine.* The Clerk of the Court is respectfully directed to terminate the pending motions at ECF No. 927.

Standby counsel for the Weingartens are directed to serve a copy of this Order as well as the Court's prior Orders dated October 12, 2021 and May 11, 2022 at ECF Nos. 388 and 625, respectfully, to their respective *pro se* Defendants by any necessary means and to file proof of service on the docket.

Dated: February 12, 2024
       White Plains, NY

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE